# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

THE UNITED STATES OF AMERICA

*ex rel.* [UNDER SEAL],

      Plaintiffs,

v.

[UNDER SEAL],

      Defendants.

**CIVIL ACTION NO.**

***FILED IN CAMERA
and UNDER SEAL***

## <u>COMPLAINT</u>

# SEALED CASE – DO NOT PUT ON PACER

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **THE UNITED STATES OF AMERICA ex rel.** **FPPD,** | **CIVIL ACTION NO.** |
| **Plaintiffs,** | |
| **v.** | *FILED IN CAMERA* |
| | *and UNDER SEAL* |
| **OCWEN FINANCIAL CORPORATION, OCWEN LOAN SERVICING, LLC, ALTISOURCE PORTFOLIO SOLUTIONS, S.A.,  ALTISOURCE RESIDENTIAL CORPORATION, ALTISOURCE ASSET MANAGEMENT CORPORATION, REALHOME SERVICES AND SOLUTIONS, INC., REAL ESTATE SERVICING SOLUTIONS, INC., PREMIUM TITLE SERVICES, INC., NATIONWIDE CREDIT, INC. AND HOME LOAN SERVICING SOLUTIONS, LTD.,** | |
| **Defendants.** | |

**FALSE CLAIMS ACT *QUI TAM* COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTORY STATEMENT ..................................................................................... 1

JURISDICTION AND VENUE ...................................................................................... 5

PARTIES ......................................................................................................................... 6

THE FEDERAL FALSE CLAIMS ACT ....................................................................... 8

FACTS AND ALLEGATIONS..................................................................................... 11

A.    THE RESIDENTIAL MORTGAGE BACKED SECURITIES ("RMBS")
      MARKET    ....................................................................................................... 11

      1.    Overview of the RMBS Market and Players, Including the OCWEN
            Defendants ..................................................................................................... 11

      2.    The Federal Investment in OCWEN and non-OCWEN Serviced RMBS .......... 16

      3.    The Relator's Investment in OCWEN and non-OCWEN Serviced RMBS ....... 19

B.    THE DEFENDANTS' MISCONDUCT ................................................................ 19

      1.    Overview of Defendants' Fraudulent Scheme ................................................... 19

      2.    Specific Examples of  Defendants' Fraudulent Behavior.................................. 25

            a.    Real Estate Commissions and Referral Fees ........................................... 25

            b.    Failure to Use Proper Real Estate and REO Professionals  .................. 28

            c.    Directed Use of Hubzu.com, "Buyer's Premium", and Related Fees .... 29

            d.    Valuation Fees, Property Preservation, and Other Settlement and
                  Closing Fees........................................................................................... 31

            e.    Delaying Property Resolution, Increasing Fees, Avoiding Repair
                  Costs, and Lowering Prices .................................................................... 32

            f.    Underutilizing "Short Sales" and Thereby Increasing Fees .................. 35

            g.    Sale of REO Properties to Related Party Bulk Investors........................ 35

            h.    Preferential Treatment of REO Property Classified as "Ocwen
                  Owned" or "Special Serviced Assets" .................................................... 36

    i.  Reducing or Deferring Principal and Interest Cash Flow to the RMBS Trusts ........................................................................................ 37

C.  DAMAGES CAUSED BY THE DEFENDANTS' MISCONDUCT ........................... 38

CLAIMS FOR RELIEF ........................................................................................... 40

  Count One, Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A) .... 40

  Count Two, Violations of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(B) ..... 41

  Count Three, Violations of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(G) ... 42

  Count Four, Violations of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(C) ..... 43

PRAYERS FOR RELIEF ......................................................................................... 45

## INTRODUCTORY STATEMENT

1.      This is an action brought on behalf of the United States of America by Plaintiff

FPPD (hereafter referred to as "Relator" or "Plaintiff") against the named Defendants, pursuant

to the *Qui Tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729-33 ("Federal

FCA" or "FCA"). This *Qui Tam* Action is brought *in camera* and under seal.

2.      Among the partners of Relator FPPD are individuals who purchased bonds, a

form of Residential Mortgage Backed Securities ("RMBS"), during the period 2009-2012.

Other bondholders/investors in these deals include the United States Government, its agencies,

and financial institutions in which the United States has a financial interest by virtue of "bailout"

measures taken in response to the housing and financial crises of 2007-2009.

3.      The underlying mortgage loans that act as collateral for these bonds are serviced

by Defendant Ocwen Financial Corporation pursuant to Pooling and Servicing Agreements

between OCWEN as "servicer" and various banks/financial institutions who act as trustees of the

trusts and the trusts themselves that are set up to act as the vehicle for the pooling of the loans

and the issuance of the bonds.

4.      Defendant OCWEN is among the largest servicers of subprime residential

mortgage loans in the United States. OCWEN claims to employ about 5,000 workers, roughly

three-quarters of them in India and Uruguay, to manage home loans of borrowers whose

mortgages have been packaged into securities and sold to investors. In this capacity, Defendant

OCWEN is responsible for all aspects of managing the loans from collecting mortgage

payments, to modification, to foreclosure and liquidation; and it uses the services of third parties,

including the other Defendants who are related parties to OCWEN, to carry out its obligations.

5.      The investors/bondholders earn money on their investment (or not) depending on

how the underlying loans in the pool perform, the fees and expenses incurred by the servicer,  the

value of any liquidated properties, and the seniority of the bond/tranche in the capital structure,

among other factors.

6.      Relator alleges that the Defendants are illegally enriching themselves at the

expense of the bondholders, including the United States. Defendants' misconduct, which is

detailed further below and in Relator's Disclosures, includes at least the following means of

enriching themselves to the detriment of the investors, including Relator and the United States:

(a) Defendant OCWEN charges excessive and unreasonable fees and expenses while

servicing the loans. It also contracts almost exclusively with the other Defendants for all

services provided to the trusts (bond issuers) in the management of the underlying

mortgage loans.  These excessive fees and self-dealing result in significantly inflated

prices charged to the trust and thus a lower return on investment to the bondholders.  At

the same time, the services provided are often well below industry standards and in some

cases are almost non-existent.  The Pooling and Servicing Agreements which govern the

relationship between the trust and OCWEN (the servicer) require a defined standard of

care which is not met most, or all, of the time.

(b) Defendant OCWEN, in coordination with other Defendants, has put in place a

business model that is not the industry norm and that has the effect of delaying the

process of liquidating real estate  after the foreclosure process (known as "real estate

owned" or "REO") allowing OCWEN to increase all manner of fees to the Defendants,

including without limitation, servicing fees, late fees, property management fees,

property preservation and maintenance fees, legal fees, referral fees, and expenses for

valuation techniques including competitive  market analysis ("CMA") and/or broker price

opinions ("BPO").  A key component of this model is directing potential buyers to a proprietary OCWEN website called Hubzu.com.  Defendants' various practices delay the sale of properties, result in lower liquidation values, and additional fees and expenses.

(c) Defendant OCWEN violates its contractual obligations to the trust under the Pooling and Servicing Agreements to continue advancing principal and interest ("P&I") on delinquent loans, once the loan is deemed "non-recoverable".  This practice is reflected in elevated "stop advance" rates compared to the industry.  In addition, OCWEN has a very high rate of modifying loans it is servicing in order to recoup prior advances and take cash flow out of the trust.  These activities significantly disrupt the cash flows to the bondholders, while dramatically lowering OCWEN's cost of funds and thus increasing its profit. Defendant OCWEN has given Defendant ALTISOURCE a mandate to prioritize loans with high advance amounts, manipulating the sale process to their advantage in order to more rapidly recover past advances.

(d) Defendant OCWEN and the other Defendants engage in self-dealing and preferential dealing by selling REO properties in bulk to related parties rather than in the competitive marketplace.

(e)  Defendant OCWEN has and uses preferential guidelines and procedures for certain REO loans deemed "OCWEN-owned assets" or "special serviced assets".  On these "special serviced assets", Defendant OCWEN is not only the servicer, but it also has a beneficial ownership in either the loans themselves or through ownership of tranches in RMBS trusts in which these loans are held.  Those tranches continue to pay interest to OCWEN as long as there are minimal losses from REO liquidations.  As such, OCWEN can control or manipulate the timing of when these losses occur by requiring Defendant

ALTISOURCE to obtain special approval in the pricing and disposition of these OCWEN-owned assets. OCWEN is manipulating to its own advantage the sale of these REO properties by inflating the sale price of the property ("Initial Listing Price"), thus preferentially handling these OCWEN-owned assets at the expense of other loans under OCWEN's servicing platform. The OCWEN-owned assets were also marketed and prepared for sale differently than other REO properties.

(f) Defendant OCWEN minimizes the use of "short sales", to the detriment of the bondholders. While short sales are very beneficial to bondholders, such sales reduce the significant fees the OCWEN Defendants can earn that are associated with going through foreclosure and on to an REO liquidation.  Industry statistics show dramatically lower percentages for short sales at OCWEN versus all other servicers.

(g) All of the Defendants (and their many subsidiaries and affiliates) conspire to carry out the above schemes and to enrich themselves to the detriment of the bondholders.

7.      These violations have exposed, and continue to expose, the United States Government, its agencies, and the United States Treasury to substantial losses in connection with bonds currently or formerly held by the United States or financial institutions in which the United States has a financial interest by virtue of various "bailout" measures taken in response to the housing and financial crisis of 2007-2009. On information and belief, the practices complained of herein have existed since at least 2006, and are continuing.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq*.

9.      To Relator's knowledge, this action is not barred by any provision of the Federal FCA.  In particular, the Federal FCA bar contained in 31 U.S.C. § 3730(4) does not apply to Relator:  there is no civil suit or administrative proceeding involving the allegations and transactions herein to which the United States is a party, there has been no statutorily defined "public disclosure" of these allegations or transactions or any allegations or transactions that are substantially the same, and, in any event, Relator is an "original source" within the meaning of the FCA.

10.     This Court has personal jurisdiction and venue over the Defendants pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because those sections authorize nationwide service of process and because each Defendant has minimum contacts with the United States.  Moreover, one or more of the Defendants can be found in, reside, and transact business in this District.

11.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this judicial district, and acts proscribed by 31 U.S.C. § 3729 have been committed by Defendants in this District.  Therefore, venue is proper within the meaning of 28 U.S.C. §1391(b) and (c) and 31 U.S.C. § 3732(a).

## PARTIES

12.    The primary real party in interest to this *Qui Tam* Action is the United States of America.   Accordingly, at this time, Relator is pursuing this action on behalf of the United States of America as well as on its/their own behalf.  *See*, *e.g.*, 31 U.S.C. § 3730(b)(1).

13.    Plaintiff/Relator FPPD is a general partnership organized under the laws of the State of Delaware.  It is comprised of individuals who bring this *Qui Tam* action based upon direct, personal, and unique information.  The identity of these partners/individuals has been provided to the United States.

14.    Defendant OCWEN FINANCIAL CORPORATION ("OCWEN") is a publicly traded corporation (NYSE:OCN).  OCWEN is one of the nation's largest providers of subprime residential loan servicing, special servicing and asset management services. OCWEN is headquartered in Atlanta, Georgia, with additional offices in West Palm Beach and Orlando, Florida, Houston, Texas, St. Croix, the United States Virgin Islands and Washington, DC, and support operations in India and Uruguay. OCWEN does business through a number of subsidiaries and related companies including the other named Defendants.

15.    Defendant OCWEN LOAN SERVICING, LLC, is a subsidiary  and the mortgage servicing arm of OCWEN, primarily engaged in the servicing of residential mortgage loans.

16.    Defendant ALTISOURCE PORTFOLIO SOLUTIONS, S.A., is a publicly traded corporation ((NASDAQ Global Select Market: ASPS), which was spun off from OCWEN in August 2009. ALTISOURCE provides services related to real estate and portfolio management and asset recovery. OCWEN Luxembourg S.à r.l. was renamed ALTISOURCE Portfolio Solutions S.à r.l. in May 12, 2009 and converted into ALTISOURCE Portfolio Solutions S.A. on June 5, 2009.  Its largest customer continues to be OCWEN. ALTISOURCE is organized under

the laws of Luxembourg and is headquartered in Atlanta, Georgia.  The company has numerous offices in the United States (including Boston, MA, Irvine, CA, Sacramento, CA, St. Louis, MO, Tempe, AZ and Vestal, NY), and offices globally in Luxembourg, Philippines, and India (in particular cities of Bagalore, Goa, and Mumbai).

17.     Defendant ALTISOURCE RESIDENTIAL CORPORATION is a publicly traded corporation (NYSE:RESI) that was spun off from Defendant ALTISOURCE in December 2012.

18.     Defendant ALTISOURCE ASSET MANAGEMENT CORPORATION is a publicly traded corporation (OTCQX: AAMC) that was also spun off from Defendant ALTISOURCE in December 2012.

19.     Defendant REALHOME SERVICES AND SOLUTIONS, INC. is an affiliate of ALTISOURCE.  The company describes itself as a national real estate brokerage specializing in the listing, marketing and sale of REO and foreclosure properties.  The company is primarily responsible for providing brokerage services for all properties derived from OCWEN serviced loans.

20.     Defendant HOME LOAN SERVICING SOLUTIONS, LTD., is a publicly traded corporation ((NYSE:HLSS), which was spun off from OCWEN in March 2012. The company's business is to acquire mortgage servicing assets consisting of servicing advances and mortgage servicing rights ("MSRs").  The primary source of these mortgage servicing assets comes from OCWEN.

21.     Defendant REAL ESTATE SERVICING SOLUTIONS, INC. is a subsidiary and the real estate brokerage division of OCWEN.

22.     Defendant PREMIUM TITLE SERVICES, INC., a subsidiary of Defendant ALTISOURCE, performs and charges for title work, including for settlement/closing fee, title search, and title insurance and an overnight/courier service.

23.     Defendant NATIONWIDE CREDIT, INC., a subsidiary of Defendant ALTISOURCE is a provider of customer relationship and accounts receivable management services.  In 2007 Defendant OCWEN acquired Nationwide Credit Inc and the division was consolidated into ALTISOURCE in 2009.

24.     The Defendants are vertically integrated and interrelated, operating under the direction of OCWEN.  Despite the claim that these are separate and distinct businesses, the Defendants have overlapping management and common ownership,  integrate policy and procedures with shared internal systems, and report directly to OCWEN across business affiliates and separate entities. They will be referred to herein collectively as "OCWEN", the "Defendants" or "the OCWEN Defendants".  In addition, the term ALTISOURCE may apply to Defendant ALTISOURCE or collectively to the Defendants spun off from ALTISOURCE.

## THE FEDERAL FALSE CLAIMS ACT

25.     This is a case brought under the False Claims Act, a federal statute that was first enacted in 1863.  During the Civil War, certain unscrupulous government contractors provided the Union Army with shoddy supplies, including horses and mules that were in poor health, faulty rifles and ammunition, and spoiled rations and other provisions.  As a result, Congress passed the original False Claims Act, which was known as the "Informer's Law" or the "Lincoln Law" after President Abraham Lincoln.  This law made it illegal to present false statements to the United States Government to improperly obtain more money from the government than the government actually owed.  In addition, Congress authorized private citizens to stand in the

shoes of the United States Government and bring claims on behalf of the Government against those that violated this law. When that happens, the private citizen is like a private attorney general "standing in the shoes" of, and representing the interests of, the United States. Such cases are known as "*qui tam*" cases, and the person bringing the case in the name of the United States is called the "relator".

26.     The False Claims Act has been amended over the years.  Currently, the False Claims Act provides, *inter alia*,  that a person or entity violates the False Claims Act if it: (1) submits or causes others to submit false or fraudulent claims to the United States for payment or approval; (2) makes, uses or causes others to make or use a false record or statement material to a claim; (3) conspires to defraud the United States by violating any provision of the FCA; or (4) avoids, decreases or conceals an obligation to pay money to the United States.

27.     The False Claims Act is designed to reach all types of fraud that might result in financial loss to the United States.  The False Claims Act is applied broadly and reaches any fraudulent attempts to cause the United States to pay out sums of money or to fail to return property or money to the United States.  A violation of the False Claims Act occurs not only in those situations in which the claims themselves are false on their face, but also in those situations where a person or company engages in a fraudulent course of conduct in seeking or causing someone else to seek payment, directly or indirectly, from government funds. To that end, the FCA contains the following relevant provisions.

28.     The Federal FCA, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented any false or fraudulent claim for payment or approval, a violation of federal law for which the United States may recover three times the amount of the damages the

government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

29.     The Federal FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

30.     The Federal FCA, 31 U.S.C.  § 3729(a)(1)(C), makes conspiring to commit a violation of the FCA, an independent violation of the FCA for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

31.     The Federal FCA, 31 U.S.C. § 3729(a)(1)(G), makes it illegal for any person to "knowingly" make, use or cause to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or to knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the Government, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

32.     The Federal FCA defines an "obligation" to pay as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-guarantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."

33.     The Federal FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.  31 U.S.C. § 3729(b)(2).

34.     The FCA, 31 U.S.C. § 3729(b)(1), provides that "(1) the terms 'knowing' and 'knowingly' – (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud."

35.     The FCA, 31 U.S.C. § 3729(b)(4), provides that "(4) the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."

36.     For the reasons discussed below, the Defendants have violated the Federal FCA and are liable to the United States for damages and penalties.

## FACTS AND ALLEGATIONS

## A.     THE RESIDENTIAL MORTGAGE BACKED SECURITIES ("RMBS") MARKET

### 1.     Overview of the RMBS Market and Players, Including the OCWEN Defendants

37.     The residential mortgage loan industry is comprised of banks, financial services and other firms that originate, underwrite, securitize, and service mortgage loans, and investors (private and governmental) who purchase residential mortgage backed securities ("RMBS") and are known as "certificateholders" or bondholders. As discussed below, the federal government is

an integral player in this market.

38.     Financial institutions such as banks buy portfolios of residential mortgage loans from originators (the primary lender), then package or bundle together groups of loan portfolios, place them into a vehicle such as a trust of which the bank is the trustee, and issue or sell to investors instruments, in the form of bonds, which gives the bondholder certain rights to payments on the subject loan "pools". The bond is in effect a type of "promissory note" on which the trust agrees to pay in return for the bondholder investing its money and providing the trust with the capital to buy the mortgage loans.  The bonds are also known as "tranches" because they are structured in a way that reflects payment and default risk within the trust's capital structure. Each tranche has different characteristics including priority of principal and interest payments, allocation of principal losses, and duration, all of which ultimately determine the return on investment.

39.     The obligations and responsibilities and rights of the depositor (the owner of the mortgage loans), the trust (which is purchasing the loans), the trustee of the trust, the "servicer" (who services and administers and manages the loans which are pooled in the trust), and the bondholders are governed by a Pooling and Servicing Agreement. One example of such a Pooling and Servicing Agreement in which OCWEN is the servicer (having acquired the original servicer to the Agreement) and partners of the Relator are bondholders is attached hereto as **EXHIBIT A** (copy of a January 1, 2006 Pooling and Servicing Agreement for the Morgan Stanley Home Equity Loan Trust 2006-1 Mortgage Pass-Trough Certificates Series 2006-1 —the "MSHEL Agreement"). Other examples are being provided to the United States as part of Relator's Disclosures.

40.     Generally speaking, servicers are responsible for providing to the trust the services set forth in the Pooling and Servicing Agreement and in accordance with the standards, representations, warranties and obligations therein. *E.g., id.* at Articles II and III. Basically, the servicer (or subservicers with whom it contracts) provides a spectrum of services as required to administer a particular loan, from collecting monthly payments of principal and interest on paying loans, to collecting taxes, assessments and similar items, to modifying loans, to foreclosing and liquidating REO, among other things. *Id.* The proceeds collected by the servicer are placed in an account (or accounts, referred to collectively in **EXHIBIT A** at, *e.g.*, Section 3.10, as the "Collection Account") and are held in trust for the benefit of the trustee. The servicer is entitled to make withdrawals from the Collection Account from time to time for certain prescribed purposes, including, *inter alia*, to pay the servicer any unpaid servicing fees or servicing advances, to pay certain servicing compensation, and to reimburse the servicer for advances and for expenses. *See generally* Section 3.11 at pp. 88-90. The servicer also receives a "servicing fee" as compensation for its activities and is required to pay all expenses incurred by it as servicer without reimbursement unless specifically allowed in the Agreement. *See, e.g.*, Section 3.21 at p. 100 of **EXHIBIT A** attached hereto.

41.     The servicer provides a monthly remittance report to the trustee which must, at a minimum, contain, *inter alia*, the amount of servicing compensation received by the servicer during the prior distribution period and the aggregate expenses reimbursed to the servicer during the prior distribution period. *See, e.g.*, Section 4.03(d) at pp. 115-116 of **EXHIBIT A** attached hereto. The Servicer Remittance Report for the loans subject to the Pooling and Servicing Agreement shows various details with respect to the loans and the servicer's expenses and compensation. *Id.*  In addition, the servicer must deliver to the trustee and others an annual

statement of compliance known as an "Officer's Certificate", *Id.* at Section 3.22, and an annual

report on assessment of compliance with servicing criteria, *id*. at Section 3.23.

42.     The bondholders' return on their investment depends in part on the seniority of

the bond in the capital structure and the distribution of principal and interest, i.e. the priorities of

distribution. *See, e.g*., Section 4.02 at pp. 105-111 of **EXHIBIT A** attached hereto.  As the

principal and interest is collected by the servicer, this "cash flow" is passed through the trust to

the bondholders in order of priority described above.  This flow of payments is also known as the

"waterfall" because senior tranches are paid principal and interest first, then to the next tranche,

and the next tranche until all available cash flow is depleted for the distribution period (often on

a monthly basis).  This too is described in the Pooling and Servicing Agreement. *See, e.g., id.*

The servicer provides monthly information on the underlying loans to the trustee.  In turn, the

trustee provides a monthly statement, known as a remittance report, to the

bondholders/certificateholders among others, setting forth certain information with respect to the

distributions, including the amount of expense fees paid to or retained by the servicer (*see, e.g*.,

Section 4.03(a) at pp. 112-114 of **EXHIBIT A** attached hereto).  In doing so, the trustee relies on

the accuracy, availability, and timeliness of the servicer's report.  *Id.* at Section 4.03(b). Attached

hereto as **EXHIBIT B** is one example of such monthly trustee reports to bondholders under the

MSHEL Agreement (**EXHIBIT A**)**;** other examples are included in Relator's Disclosures to the

United States.

43.     Generally speaking, there are two different categories of mortgage loans that can

be pooled in the trust as collateral (i.e. the source of repayment) for RMBS deals. Among them

are what are known as:

(a) Agency loans (loans issued or guaranteed/insured by United States federal

government-sponsored enterprises such as Fannie Mae, Freddie Mac, or Ginnie Mae, or a federal government agency or program such as the Department of Housing and Urban Development or Federal Housing Administration—"HUD" and/or "FHA", and the Veteran's Administration—"VA"), as discussed below; and

(b) Non-Agency loans (ones without such federal government guarantee).

Non-Agency RMBS are typically classified by the underlying collateral/type of mortgage, which do not qualify under the Agency loan guidelines; the major types are Prime (loan to a borrower with good credit that generally meets the lender's strictest underwriting criteria), Alt-A (loan to a borrower with good credit but with limited documentation, or other characteristics that do not meet the standards for Prime loans), Subprime (loan to a borrower with poor credit), and Option ARM ( an adjustable rate loan that gives the borrower a set of choices of how much interest and principal to pay each month, including the option to negatively amortize the loan). Other non-Agency RMBS collateral types include traditional Second Liens, Home-Equity Lines of Credit (HELOCs) and Scratch & Dent (loans that are considered re-performing or have a prior history of delinquency).

Defendant OCWEN is one of the four largest servicers of non-Agency Subprime loans underlying RMBS, with specialization in servicing Subprime and Alt-A. As of 11/30/2012, the non-Agency RMBS market was estimated at approximately $950 billion, and the four largest servicers in non-Agency loans were: Bank of America;   JPMorgan Chase; Wells Fargo; and Defendant OCWEN. Once Defendant OCWEN's pending acquisitions of Homeward Residential Holdings, Inc. ("Homeward") and Residential Capital, LLC ("Rescap") are completed as scheduled in Q1 of 2013, OCWEN will become the second largest servicer of non-Agency

Subprime loans, surpassing JPMorgan Chase and Wells Fargo. In Subprime, Defendant OCWEN

will move from 25% to 42% market share once these acquisitions are completed, or twice the

market share of Bank of America. These two pending OCWEN acquisitions will bring

OCWEN'S entire servicing and subservicing portfolio (non-Agency, Agency, portfolio) from

$127 billion (as of 9/30/2012) to approximately $362 billion, which is a remarkable 185%

increase.

**2.**     **The Federal Investment in OCWEN and non-OCWEN Serviced RMBS**

44.     The United States  government plays an integral and major role in the financing of

the residential housing market by providing an array of mortgage loan repayment insurance or

guarantee programs to private lenders and borrowers through the purchase and issuance of

Agency mortgage-backed securities (as referenced above), and until 2008, by also purchasing

(i.e. investing in) non-Agency RMBS as bondholders.

45.     The United States government's role is carried out through numerous agencies

and programs; most relevant for this complaint are the Federal National Mortgage Association

("FNMA" or "Fannie Mae"), the Federal Home Loan Mortgage Corporation ("FHLMC" or

"Freddie Mac"), and the Government National Mortgage Association ("GNMA" or "Ginnie

Mae"). The fundamental purpose of these entities and agencies is to provide liquidity, stability,

and affordability to the United States residential housing and mortgage markets.

46.     To effectuate their missions, these entities invest in RMBS offered for sale by

banks, financial service firms and others. In essence, by purchasing securities backed by

mortgage loans, they provide liquidity to the market so banks and lenders, etc. may continue to

lend money, originate new mortgage loans, and increase homeownership. However, if there is a

loss on the mortgages through default or foreclosure, these entities and agencies, like the other

investors, risk losing money.

47.     The United States, its entities and agencies owned *over $140 billion* of non-Agency RMBS when the downturn in the housing market occurred starting in 2007. As a result of substantial losses in the residential housing market, Fannie Mae and Freddie Mac were placed under the control of a conservator, the Federal Housing Finance Agency ("FHFA"), in July 2008 because they were unable to meet their obligations without assistance from the federal government. By doing so, the federal government guaranteed their debt using federal monies.

48.     The following chart shows the non-Agency RMBS owned by Fannie and Freddie as of 12/31/2009 and the most recent quarter 9/30/2012.  The RMBS portfolios were purchased prior to conservatorship and are comprised mostly of pools of loans originated 2007 and earlier, because new issuance of non-Agency RMBS halted once the financial crisis began.

|  | Holdings ($mn) | | | |
|  | Fannie Mae | | Freddie Mac | |
|  | 12/31/2009 | 9/30/2012 | 12/31/2009 | 9/30/2012 |
| Subprime mortgage loans: | 20,527 | 15,437 | 61,019 | 45,166 |
| Option ARM mortgage loans: | 6,099 | 4,348 | 17,687 | 12,477 |
| Alt-A mortgage loans: | 18,406 | 13,392 | 17,998 | 13,055 |
| **TOTAL** | **45,032** | **33,177** | **96,704** | **70,698** |

| **12/31/2009:** | **141,736** |
| **9/30/2012:** | **103,875** |

As this table shows, during the time period at issue in this Complaint, Fannie Mae and Freddie Mac have owned a substantial amount of Subprime RMBS, an area in which Defendant OCWEN specializes.  Overall, Relator estimates that Fannie and Freddie have owned about 18% of

OCWEN's book of business, and that in late 2012 OCWEN serviced about $23 billion in RMBS owned by Fannie Mae and Freddie Mac.

49.     The economic crisis brought other federal monies and funds into the market in other ways. For example, many financial institutions received federal monies and guarantees through the Troubled Asset Relief Program ("TARP") and the United States Treasury Department effectively invested in certain institutions by injecting capital in the form of preferred and common stock and by guaranteeing certain obligations.

50.     In 2009, TARP created an initiative to support secondary RMBS markets through the Legacy Securities Public-Private Investment Program ("PPIP").   The PPIP  approved 9 large asset managers to raise capital for funds (a public-private investment fund or "PPIF") to invest in RMBS and commercial mortgage-backed securities ("CMBS").  The Treasury  then provided inexpensive financing (leverage) to help facilitate large purchases in these bonds.  As of 9/30/2012 , the Treasury had committed over $25 billion of equity and debt in various PPIFs. Overall, $10.3 billion or approximately 74% of the PPIF portfolio holdings are non-Agency RMBS. These funds own RMBS that are serviced by Defendant OCWEN.

51.     The federal government undertook other steps as well in an effort to stem residential foreclosures and losses in the housing market. In February 2009 the Treasury announced TARP's signature housing program under Making Home Affordable ("MHA"), named the Home Affordable Modification Program ("HAMP"), under which mortgages would be modified to a payment that is "affordable" and "sustainable".  HAMP distributed TARP funds to various banks and mortgage servicers as incentive payments for home loan modifications.  As of 12/31/2012, Defendant OCWEN has received over $347 million TARP funds in the form of incentive fees.

52.     The Federal Reserve Bank and its member banks have also purchased RMBS or owned bonds by virtue of bailing out certain firms during the economic crisis. For example, the bailout portfolios of Maiden Lane I, II, and III, previously sponsored and co-owned by the Federal Reserve Bank of New York, were comprised of non-Agency RMBS and other structured products in which the underlying loans are serviced by Defendant OCWEN. A listing of the Maiden Lane portfolios serviced by Defendant OCWEN (totaling over $2.8 billion as of 3/31/2011) is being provided to the government as part of Relator's Disclosure.

### 3.     The Relator's Investment in OCWEN and non-OCWEN Serviced RMBS

53.     Among the partners of Relator FPPD are individuals who currently or were previously bondholders in some 25 non-Agency RMBS deals involving loans for which Defendant OCWEN is the majority servicer ("the OCWEN serviced loans") and an additional 9 non-Agency RMBS deals in which OCWEN services a portion of the underlying loans.  A listing of those deals is being provided to the government as part of the Relator's Disclosure.

54.     In addition,  entities controlled by partners of Relator FPPD currently or were previously  bondholders in over 180 RMBS deals in which the mortgage loans are serviced by entities other than Defendant OCWEN ("the non-OCWEN serviced loans").  A listing of those deals is being provided to the government as part of the Relator's Disclosure.

## B.     THE DEFENDANTS' MISCONDUCT

### 1.     Overview of Defendants' Fraudulent Schemes

55.     As noted above, Defendant OCWEN is one of the largest servicers of non-Agency RMBS loans in the United States.  As of 9/30/2012, Defendant OCWEN serviced approximately 800,000 loans with an unpaid principal balance ("UPB") of over $125 billion.   In most cases, OCWEN has purchased the Mortgage Servicing Rights ("MSR") or has been contracted as a

subservicer to service loans on the behalf of other entities.   OCWEN earns residential servicing and subservicing fees of approximately $575 million *per year* (i.e. one-half percent of the UPB per annum–*see* **EXHIBIT A** Article I Definition of "Servicing Fee Rate"). In addition, OCWEN receives all the other fees, expenses, and other compensation it may be entitled to under any given Pooling and Servicing Agreement for administering the loans. Further, Defendant OCWEN has contracted Defendant ALTISOURCE to service the real estate owned ("REO") portion of their servicing portfolio, of which about 30,000 homes are liquidated or sold by Defendant ALTISOURCE on an annual basis.   A spreadsheet showing the growth in OCWEN's servicing and UPB is being provided to the government with Relator's Disclosure. As of 11/30/2012, OCWEN serviced over 530 pools of non-Agency loans in RMBS deals.   A listing of those deals is being provided to the government with Relator's Disclosure.

56.     Defendant OCWEN claims to employ about 5,000 workers, roughly three-quarters of them in India and Uruguay, to manage home loans of borrowers whose mortgages have been packaged into securities and sold to investors.   The properties themselves are all located in the United States. OCWEN does business through a network of affiliated and related companies, including the other named Defendants. Most, if not all, of these entities act as "subservicers" or "affiliates" within the meaning of the Pooling and Servicing Agreements (*see, e.g*., **EXHIBIT A** Article I Definition of "Affiliate" at p. 26 and "Subservicer" at p.61 and Article II Section 3.02 at pp. 80-82).   A spreadsheet showing the OCWEN Defendants and their subsidiaries and related entities is being provided to the government as part of Relator's Disclosures.

57.     Of particular importance is Defendant ALTISOURCE PORTFOLIO SOLUTIONS, S.A., which was spun off from OCWEN in August 2009.  Although OCWEN is

now a separate company, OCWEN and ALTISOURCE share the same Chairman, William C. Erbey, who owns about 13% of OCWEN and about 25% of ALTISOURCE.  There is also overlapping senior management of the two companies and a mixing of management responsibilities across companies.  While some inter-company relationships purport to be arms length, most, if not all, are demonstrably *not* arms length.

58.     OCWEN utilizes Defendant ALTISOURCE as the subservicer and affiliate under the Pooling and Servicing Agreements to which OCWEN is a party.  ALTISOURCE provides all the asset management services for its former parent's REO properties through a collection of subsidiaries, affiliates, and related companies that have recently been spun off from ALTISOURCE, including several also named as Defendants in this Complaint (collectively "ALTISOURCE" OR THE "ALTISOURCE Defendants").  OCWEN and ALTISOURCE entered into an initial Services Agreement for a 2 year period, and eventually into a long term Services Agreement that runs until August 2020. The functions performed by ALTISOURCE seem to be the same as before the new entity was formed, but with the separation, the services are defined in three revenue groups: 1) Mortgage Services; 2) Financial Services; and 3) Technology Products.   OCWEN is ALTISOURCE's largest and maybe only customer; ALTISOURCE operations are primarily run out of three offices in India, and the vast majority of employees are in India (reportedly there are about 120 asset managers in India allegedly handling REO Properties in the United States versus 6 such managers in the United States; and 6,000 total employees in India versus 300 in the United States).

59.     The OCWEN and ALTISOURCE Defendants' business model is to keep all servicing activity "in house", using all the various subsidiaries, affiliates, and related companies. This model benefits the Defendants because a multitude of fees, expenses, and other servicing

related revenue can be charged throughout the entire mortgage servicing process with all the

revenue kept "in house".  Without contracting independent third parties, and instead using

captive and affiliated companies, the servicing process is made more expensive for the

bondholders.  This "in house" model maximizes profit to the Defendants and results in

substantially lower return to the bondholders while providing little transparency or oversight in

the scope of services and capacity of fees charged.

60.     OCWEN (and ALTISOURCE as Subservicer and Affiliate) are obligated under

the Pooling and Servicing Agreements to provide "Accepted Servicing Practices" which means

that:

(a) For and on behalf of the Certificateholders [bondholders], the Servicer shall service
and administer the Mortgage Loans for which it is acting as Servicer in accordance with
the terms of this Agreement and the respective Mortgage Loans and, to the extent
consistent with such terms, **in the same manner in which it services and administers
similar mortgage loans for its own portfolio, giving due consideration to customary
and usual standards of practice of mortgage lenders and loan servicers
administering similar mortgage loans** but without regard to:

(i)      any relationship that the Servicer, any Subservicer or any Affiliate of the
Servicer or any Subservicer may have with the related Mortgagor;
(ii)     the ownership or non-ownership of any Certificate by the Servicer or any
Affiliate of the Servicer;
(iii)    the Servicer's obligation to make P&I [principal and interest] Advances or
Servicing Advances; or
(iv)     the Servicer's or any Subservicer's right to receive compensation for its
services hereunder or with respect to any particular transaction…

To the extent consistent with the foregoing, the Servicer shall seek to maximize the
timely and complete recovery of principal and interest on the Mortgage Notes.

See **EXHIBIT A** attached hereto at Article I Definitions "Accepted Servicing Practices" (at p.

25) and Article III at Section 3.01(a) (at pp. 78-79) (emphasis added).

61.     The Pooling and Servicing Agreements place certain obligations on OCWEN (and

ALTISOURCE) with respect to "Realization upon Defaulted Mortgage Loans"; in particular,

"The Servicer shall use its best efforts, consistent with Accepted Servicing Practices, to foreclose upon or otherwise comparably convert (which may include an acquisition of REO Property) the ownership of properties securing such of the Mortgage Loans as come into and continue in default…The Servicer shall use reasonable efforts to realize upon such defaulted Mortgage Loans… ."  *See, e.g.,* **EXHIBIT A** attached hereto at Article I Definitions "Accepted Servicing Practices" (at p. 25) and Article III at Section 3.15 (at p. 94). "REO Property" means "A Mortgaged Property acquired by the Trust Fund through foreclosure or deed-in-lieu of foreclosure in connection with a defaulted Mortgage Loan." *Id*. Article I at p. 56.

62.     OCWEN (and ALTISOURCE) also have certain obligations with respect to "Title, Conservation and Disposition of REO Property"; in particular, section 3.17 of the Pooling and Servicing Agreement, which provides, *inter alia*:

> (b) The Servicer shall manage, conserve, protect and operate each REO Property for the Trustee solely for the purpose of its prompt disposition and sale. The Servicer, either itself or through an agent selected by the Servicer, shall manage, conserve, protect and operate the REO Property in the same manner that it manages, conserves, protects and operates other foreclosed property for its own account, and in the same manner that similar property in the same locality as the REO Property is managed. The Servicer shall attempt to sell the same (and may temporarily rent the same for a period not greater than one year, except as otherwise provided below) on such terms and conditions as the Servicer deems to be in the best interest of the Trustee…

> (g) The Servicer shall use its reasonable best efforts to sell, or cause its Subservicer to sell, in accordance with Accepted Servicing Practices, any REO Property serviced by the Servicer or the Subservicer as soon as possible, but in no event later than the conclusion of the third calendar year beginning after the year of its acquisition by the Pooling-Tier REMIC-1…the Servicer shall manage, conserve, protect and operate each REO Property serviced by the Servicer for the Trustee solely for the purpose of its prompt disposition and sale in a manner [subject o certain limitations] …Pursuant to its efforts to sell such REO Property, the Servicer shall either itself or through an agent selected by the Servicer protect and conserve such REO Property in the same manner and to such extent as is customary in the locality where such REO Property is located … .

*See* **EXHIBIT A** attached hereto at Article I Definitions "REO Property" (at p.56) and Article III at Section 3.17 (at pp. 97-99).

63.     The OCWEN and ALTISOURCE Defendants are violating many of their most basic obligations under the relevant Pooling and Servicing Agreements, and engaging in a variety of fraudulent schemes to enrich themselves at the expense of the bondholders, including the United States. Defendants' misconduct, which is detailed further below and in Relator's Disclosures, includes at least the following:

- The OCWEN and ALTISOURCE Defendants are charging excessive and unreasonable fees and expenses throughout the servicing of the loans. They contract almost exclusively with and among each other (all of whom are affiliates and related parties) for all services provided to the RMBS trusts in the management of the underlying mortgage loans.  This "in house" business model results in excessive fees and self-dealing which in turn result in significantly inflated prices charged to the trust and thus a lower return on investment to the bondholders.

- The Defendants are charging fees and prices that are on average two to three times the industry norm and what is reasonable under the industry norm. Among the inflated fees charged at closing are: real estate commissions; referral fees; a "buyer's premium"; settlement and closing fees; title search and title insurance fees; overnight/courier fees; property preservation fees; attorney's fees; "technology fee"; and miscellaneous other fees in connection with the liquidation of properties. After closing, the Defendants reap the benefit of these fees, to the detriment of the bondholders who realize less value than they should have from the liquidated asset.  In the Relator's Disclosure to the United States there is a list of 66 individual fee categories charged during the REO process, many of which are excessive, unreasonable, and outside the industry norm.

- At the same time, the  services Defendants provide are often well below industry standards and in some cases are almost non-existent.  The Pooling and Servicing Agreements which govern the relationship between the RMBS trust and the Defendant OCWEN (as servicer) and the other Defendants including ALTISOURCE (as subservicers and affiliates) require a defined standard of performance which Defendants fail most, if not all, of the time.

64.     Each of the areas described below is an example of one in which the OCWEN and ALTISOURCE Defendants are breaching their obligations, carrying out their fraudulent schemes, and violating the False Claims Act. Each of these categories of misconduct causes

harm to the bondholders (including the United States) and results in violations of the False Claims Act.

65.     The examples include some of the myriad ways in which Defendants are charging excessive or inflated fees, failing to provide services in compliance with the Pooling and Servicing Agreements,  engaging in various types of self-dealing, delaying the REO liquidation process,  directing potential buyers of REO properties to the Defendants' proprietary website www.Hubzu.com, and engaging in behavior that lowers the liquidation value of REO properties, all to the profit of the Defendants and the detriment of the RMBS trust and thus the bondholders.

## 2.     **Specific Examples of Defendants' Fraudulent Behavior**

### a.     **Real Estate Commissions and Referral Fees**

66.     The Defendants rarely use local, independent, qualified real estate brokers to represent the trust as seller, market and show the REO property, assist with closing procedures, and be paid a commission upon successful closing. Rather, a subsidiary of Defendant ALTISOURCE, Defendant Real Home Services and Solutions, Inc. ("RHSS") has entered into listing contracts with Defendant OCWEN for the exclusive right to sell REO properties.  RHSS employs on salary a cadre of real estate brokers around the country who do not perform, and are not capable of performing, such services.  Nevertheless, the Defendants charge a real estate commission which would normally go to an outside traditional broker.

67.     RHSS almost always serves as the listing agent and is paid 3% of the property's net purchase price, or a minimum broker commission of $2,500 plus 1.5% of the net purchase price. If the buyer is represented without a real estate agent, RHSS is paid the full 6% commission, excluding a referral fee (as described below).  The procedure implemented by ALTISOURCE discourages the use of a buyer's agent.  The buyer must transact and direct all

bids through the use of ALTISOURCE'S own obscure website known as Hubzu.com, formerly

GoHoming.com (see below for more detail).  The directed use of Hubzu.com provides a

disincentive for a buyer to use their own agent as the traditional real estate sales process is

thwarted, with the goal of Defendant ALTISOURCE collecting the full 6% commission on

property transactions where there is virtually no traditional "broker" involvement of any sort by

Defendants.

68.     To illustrate this point, there are only some twenty RHSS realtors handling

listings across the entire United States.  For example, one realtor handles all listings in New

York, Connecticut, Maine, Rhode Island, New Hampshire, Vermont and Massachusetts, while

two agents handle all of Florida (one of the states hardest hit by the housing crisis).  Clearly

these agents are "listing brokers" in name only as there is no way they can be qualified to or

physically able to represent properties in such a large area.  This is confirmed by anecdotal

information described below about how voicemail messages instruct callers such as potential

buyers or buyer's brokers not to leave a voicemail as it will not be returned.  Agents are paid a

salary by RHSS and ALTISOURCE pockets all of the commissions.  Currently, ALTISOURCE

sells around 30,000 homes per year.  This means that each RHSS realtor on average handles the

listing and "marketing" for 1,500 homes.  By contrast, a typical traditional realtor might handle 6

to 8 closings in a year.

69.     As an example, if ALTISOURCE sells 30,000 homes annually at an average price

of $100,000 (a conservative figure considering RealtyTrac reported REOs sold nationally for an

average price of $161,954 in the third quarter of 2012), then a 3% commission equals annual

revenue of $90,000,000.  The National Association of Realtors estimates that approximately 10%

of all real estate transactions are done without an agent representing the buyer.  If there is no

buyer's agent on 10% of property sales and ALTISOURCE receives the other 3% of the

commission, then the annual revenue increases by another $9,000,000.  In other words, from the

above example, Defendant ALTISOURCE "earns" approximately $99,000,000 in commissions

on the work of twenty agents, or $4,950,000 per agent.  In fact, these agents are likely

compensated up to about $100,000 per year. Thus, on an expenditure of $1-2 million per year,

the defendants charge the bondholders $99 million per year.

70. On top of the commission, ALTISOURCE charges each REO transaction an

additional "referral fee" ultimately payable to OCWEN, even though ALTISOURCE is not

independent of OCWEN.  Defendant OCWEN on behalf of the RMBS trust (as property seller),

has contracted ALTISOURCE, on an exclusive basis, to act as a subservicer and handle all REO

properties that are serviced by OCWEN.  By directing the seller (RMBS trust) to exclusively use

ALTISOURCE as a referral listing agent, OCWEN extracts a referral fee in connection with

every sale.  At closing, the referral fee is sent directly from ALTISOURCE to Defendant

OCWEN.  Often the referral fee is split into two payments, each of which goes to different

entities or subsidiaries all listed as Defendants.  The first referral fee is 1.5% of the property sale

price and is paid directly to Defendant RESS, an OCWEN subsidiary.  The second referral fee is

either 0.5% of a property sale price equal to or greater than $80,000 OR for all other properties,

an amount equal to $1,700 less the minimum buyer broker commission.  The second referral fee

is paid directly to Defendant ALTISOURCE.  A referral fee is unique to loans serviced by

OCWEN and is not standard with loans sold through REO by government agencies Fannie Mae,

Freddie Mac or Ginnie Mae; nor is it standard in the industry.  Using the above example, if

ALTISOURCE sells 30,000 homes annually at an average price of $100,000, then an average

2.0% referral fee produces annual revenue to Defendants OCWEN and ALTISOURCE of

$60,000,000.  This $60 million dollar per year figure can fairly be described as commercially unreasonable and unnecessary in light of the related and affiliated nature of the two companies. It is a poorly disguised pattern of self-dealing.

**b.      Failure to Use Proper Real Estate and REO Professionals**

71.      An agent who lists 1,350 homes per year across numerous states cannot physically provide the services associated with a listing broker.  In short, ALTISOURCE violates the applicable standard of care in a typical residential real estate transaction.  ALTISOURCE does not provide any marketing of the properties beyond placing them on their own obscure website known as Hubzu.com (formerly GoHoming.com).  When one calls the listing agent on these homes, the message instructs the caller not to leave a voicemail as it will not be returned. A potential buyer or their agent can inquire, make offers etc. only through the Hubzu.com website. The buyer or buyer's agent can obtain only limited information on the property; there is no proper access to the selling agent, and physical access to the property is difficult or non-existent, resulting in lost value from every real estate transaction represented by ALTISOURCE. In many instances, the properties are either not listed or improperly listed on the Multiple Listing Service ("MLS") reducing visibility, accessibility, and market competitiveness. The ALTISOURCE listing brokers are not incurring the kind of marketing and other expenses a typical broker would incur, nor are they performing the services such a broker would perform, yet ALTISOURCE is charging a commission *in addition to* other REO related services and fees as described herein.

72.      Internal ALTISOURCE asset managers are responsible for managing the REO property liquidation process from the initial listing to the property sale. The asset managers primarily rely on third party broker's price opinions ("BPO") or competitive market analysis

("CMA").  This data is often from independent agents because the RHSS listing broker has almost never visited the property and may not be competent in the local geography and data to render a credible opinion. Also, internal procedures severely limit a U.S. based REO manager's ability to make a proper decision on the sale of the property, as all decisions are made by a team in India.  The entire sale process of an REO property is almost always done without one ALTISOURCE representative ever physically visiting the property or providing necessary in-person due diligence. Indeed, with the vast majority of its employees located overseas, such physical presence is practically impossible.

**c.**      <u>**Directed Use of Hubzu.com, "Buyer's Premium", and Related Fees**</u>

73.     All communications and inquires regarding REO properties, offers to purchase, counteroffers or other documents relating to the sale of the property must be submitted through Defendant ALTISOURCE's proprietary website Hubzu.com (formerly GoHoming.com and also known as AltisourceHomes.com). Hubzu.com is designed to facilitate all ALTISOURCE REO transactions through a central interface; however the design unjustly enriches the Defendants at the expense of the seller (RMBS trust), while providing a substandard process for the buyer. Overall, the directed use of this obscure website results in properties not selling, being pulled from the market, disrupting and delaying the sale process, and lower ultimate sales prices, all to the detriment of the trust and the bondholders.

74.     All listed REO properties on Hubzu.com are expected to be sold either through a process known as "Auction Listings" (also described as time limit bidding or "TLB") or through a traditional sale or "No Time Limit Listings".  TLB is an auction-style process where the buyer bids against other potential buyers during a distinct time period, while No Time Limit Listings

allow properties to sit until sold.  There is little transparency of the parties involved during the bidding process and many transactions never get approved.

75.     A successful or winning bid results in two fees paid directly to Defendant ALTISOURCE: a "Technology Fee" and a "Buyer's Premium".  The Technology Fee is charged to all buyers who purchase a property through Hubzu.com and the $299 fee is included as part of the purchase price.  The Buyer's Premium is also charged to all buyers via Auction Listings and is based on the value of the property, and ranges from $625 to 5%.  Defendant ALTISOURCE claims this fee is included as part of the purchase price, and covers the cost of marketing the property and facilitating the sale. However, these marketing and sale costs are traditionally offset by the broker commissions, which are being charged by ALTISOURCE on top of the Buyer's Premium.  In other words, a higher priced property would yield a higher Buyer's Premium for no extra work by the Defendants. **Adding together a full broker commission of 6%, a referral fee of 2%, and a Buyer's Premium of 5% results in up to 13% of total fees charged by the collective Defendants.**

76.     To make matters worse, the Technology Fee and Buyer's Premium are not actually paid by the buyer, as described by "charged to Buyers" under the website's Terms & Conditions.  In fact, within the Purchase and Sale Agreement, the Defendant ALTISOURCE disguises that the seller (the RMBS trust) shall pay at closing, on behalf of the buyer, the Technology Fee and the Buyer's Premium.  The fees are included as part of the purchase price but is then credited or paid by the seller.  There is evidence also that the Technology Fee is again added to the HUD-1 settlement statement as a separate line item.  As the seller, bondholders within the trust have no ability to discern these fees or contest the payments to Defendant ALTISOURCE.  In particular, the Technology Fee appears to be unique in the industry to

OCWEN, and no where does OCWEN or ALTISOURCE explain what actual "technology" purportedly justifies the fee.

> **d.** **Valuation Fees, Property Preservation, and Other Settlement and Closing Fees**

77.     ALTISOURCE primarily relies on independent brokers to provide a broker's price opinion ("BPO") or a competitive market analysis ("CMA") in order to value the REO property.  There is evidence ALTISOURCE pays these third party brokers approximately $40 per BPO/CMA while charging the seller (RMBS trust) up to $117 per BPO/CMA, a 192% mark-up.  ALTISOURCE requires an updated BPO every 90 days while the property is on the market, often resulting in multiple inflated charges.  As a guideline on restrictions of servicing fees under recently imposed industry servicing standards, BPO fees should be limited to one every 12 months unless required by the seller.  In addition, an "REO Valuation" cost ranging from $134 to $477 is charged on top of the BPO/CMA fee.  In aggregate these valuation fees relating to each property are excessive and not competitive with the industry and marketplace.

78.     Defendant ALTISOURCE has contracted an internal property management division called Property Preservation and Inspection ("PPI") to maintain and preserve REO properties.  Throughout the REO process, PPI is paid on-going property preservation fees despite using a network of vendors to perform its property management, home repairs and inspections.  On top of on-going fees, the Defendant charges a standard $700 property preservation fee at closing for "property preservation" on every REO sale.  There is little evidence to support actual services were performed to charge an extra $700 property preservation fee per property, another example of an excessive fee and a noncompliant service.  In addition, a "Property Inspection Fee" of $11 is charged per property, in some cases up to 7 times per property during the REO period before sale.  With such a small percentage of their workforce in the United States, it is

practically impossible for the Defendants to engage in the kinds of due diligence with respect to "property preservation" to justify this category of undifferentiated expenditure.

79.     Defendant ALTISOURCE also charges an inflated fee for the removal of unwanted items and trash from a new REO property, known as a "Trashout" fee.  This fee is typically $1,100 or more and is often charged numerous times per property.  Again, it is not plausible that this service is being performed at that level (if at all) given how few employees Defendants have in the United States.

80.     Defendant Premium Title Services, Inc., another subsidiary of Defendant ALTISOURCE, performs and charges for title work, including for settlement/closing fee, title search, and title insurance and an overnight/courier service. HUD-1 settlement statements show that charges related to these services are high relative to others in the industry.

81.     Moreover, "earnest fees" or deposits on the homes by the potential buyer are sometimes retained by Defendant OCWEN when a potential buyer defaults on the purchase contract.  Defendant OCWEN may keep this money and there is little evidence or visibility if these earnest fees are rightfully returned to the trust or bondholders as beneficial owners of the property.

      **e.   Delaying Property Resolution, Increasing Fees, Avoiding Repairs, and Lowering Prices**

82.     Defendants' conduct and business model delays the process of liquidating real estate through the REO process in order to increase all manner of fees to the Defendants, including without limitation, servicing fees, late fees, property management fees, property preservation and maintenance fees, and expenses for valuation techniques. At the same time, the Defendants avoid expending any money on repairs that would increase the properties' marketability.

83.     The basic business model or philosophy of Defendant ALTISOURCE in managing and marketing REO properties is to invest little or no money in improvements (except for a code violation or on FHA loans which they try to discourage) and list properties initially at higher than market prices ("Initial Listing Price"), resulting in houses sitting on the market for longer than necessary.  Moreover, the business model of handling everything within the ALTISOURCE network and from India rather than using third party professionals in the local market slows down the entire process and results in a lower ultimate liquidation value of the property. While the houses "sit" awaiting liquidation, with little to no repairs to increase the marketability of the property, the OCWEN Defendants continue to reap fees at the expense of the seller or RMBS trust (i.e. bondholders).  Generally speaking, the only properties that get repairs are FHA properties and repairs are made only if absolutely necessary. However, in part for this reason, at one point Defendant ALTISOURCE did not want to put FHA properties on its website and tried to discourage FHA qualified buyers from bidding on properties.  FHA loans constitute a large part of the housing market, so discouraging FHA loans would reduce marketability, sales price, and ultimate liquidation value of the property.

84.     Defendant ALTISOURCE also uses a faulty valuation method based largely on internal proprietary models derived from India.  While the model does take into account BPOs and CMAs, the output creates an inflated beginning asking price or "Initial Listing Price" (as described in more detail below).  U.S. based asset managers have consistently noted that the model creates an unrealistic Initial Listing Price without sufficient local market intelligence.  If homes were appropriately priced, a selling agreement would often happen within 30 days. However, it is estimated that only about 10% of the REO properties are "priced right"; the remaining 90% sit on the market, earning fees for the Defendants.  The above market asking

prices lead to few if any offers during the first 30-45 days.  After the initial time period, an automatic price reduction program is implemented.  This systematic price reduction program does not account for characteristics specific to individual properties, but rather uses a blanket policy to slowly reduce asking prices.  The price reduction occurs at lengthy intervals (first price reduction of 45 days, then 30 days thereafter) and at a small percentage reduction rate (5%) that does not sufficiently adjust asking prices to current market values.  However, in the meantime, the Defendants collect fees.

85.     To further disrupt, delay and complicate the REO process, Defendant ALTISOURCE forces buyers to use the Hubzu.com website, enabling Defendants to collect the wide variety of fees described above.  There is little evidence that properties are sold at the best possible price through Hubzu.com, reducing the recovery value to the seller (RMBS trust). Indeed, houses not listed on the website close faster and at higher prices than those on the auction site. For example, some states like Nebraska prohibit online real estate auctions so the REO properties could not be marketed on Hubzu.com. Instead, ALTISOURCE's REO sales were handled the traditional way with local agents. Those houses sold much faster and at higher prices.

86.     The exclusive use of internal RHSS listing agents is another major impediment to the proper handling, timing, servicing of the REO properties. The limited availability and lack of response by RHSS listing agents slows the sales process and leaves the property in an uncompetitive position in the local market.

87.     In short, the complete lack of any normal marketing effort by Defendant ALTISOURCE combined with directing the listings on Hubzu.com results in significantly reduced recovery values on the liquidated REO property.  By charging for a full suite of "in

house" services, including title insurance, asset valuation, property preservation, website-related fees, transactional fees and broker commission, at inflated and unjustified rates, the Defendants have collectively enriched themselves while lowering the return for bondholders.

### f.     Underutilizing "Short Sales" and Thereby Increasing Fees

88.     The OCWEN Defendants undertake steps to avoid "short sales". In a short sale, the lender/owner of the mortgage encourages the borrower/homeowner to accept an offer for sale that is less than the value of the mortgage, and in return, the lender agrees to forgive the difference and the property avoids foreclosure. While short sales are beneficial to bondholders because they avoid the lengthy and costly foreclosure process, short sales shorten the time a loan can be serviced by OCWEN and ALTISOURCE. If a short sale is not pursued, the OCWEN Defendants can continue to collect all the aforementioned fees and commissions throughout the entire servicing process including REO and liquidation. Industry statistics show dramatically lower percentages for short sales at OCWEN versus all other RMBS servicers.

### g.     Sale of REO Properties to Related Party Bulk Investors

89.     Defendant OCWEN and the other Defendants engage in self-dealing and preferential dealing by selling REO properties to related party bulk investors rather than in the competitive marketplace.

90.     There are a number of "bulk buyers" who submit private bids to Defendant ALTISOURCE rather than through the Hubzu.com website. In general, properties intended for bulk sale are pulled from the general REO inventory and offered up to bulk investors. Bulk sales occur monthly and there are internal code names for the bulk buyers to disguise identity. At least one of the bulk buyers was an investment group started by a former OCWEN employee. The bulk sales occur in many different states and regional areas. The offers on these bulk sales are

well below the Initial Listing Prices. For example, a property listed at $15,000 may be sold to the bulk investor for only $5,000.

          **h.**      **Preferential Treatment of REO Property Classified as "OCWEN Owned" or "Special Serviced Assets"**

91.     Defendant ALTISOURCE, in collusion with Defendant OCWEN, is handling certain REO assets, deemed as "special serviced assets" or "OCWEN-owned assets" differently than  other REO assets.  On these "special serviced assets", Defendant OCWEN is not only the servicer, but it also has a beneficial ownership in either the loans themselves or through ownership of the tranches in RMBS trusts in which these loans are held.  Those beneficial tranches continue to pay interest to OCWEN as long as there are minimal losses from REO liquidations.  As such, OCWEN can control or manipulate the timing of when these losses occur by requiring Defendant ALTISOURCE to obtain special approval in the pricing and disposition of these OCWEN-owned assets.

92.     The OCWEN Defendants, including ALTISOURCE, are manipulating the sale of these "special serviced assets" by treating the Initial List Price of the REO property differently than regularly serviced loans.  These properties have an Initial Listing Price set at the greater of 107% of the highest low CMA OR 110% of Asset Value (as determined by internal valuation models). Further, these properties are listed at 100% to 110% of the mid CMA value.  In contrast, other loans not designated as "special serviced assets" are set at an Initial Listing Price of 94% of the Asset Value (for 13 states) and 98% of asset value for the remaining states. To illustrate the point further, a sale less than 90% of the Initial List Price for a special serviced asset, can *only* be approved by ALTISOURCE's President. If the Initial Listing Price is 107%-110% of the Asset Value, then this 90% guideline doesn't allow for properties to be sold for less than the true market value of the house.  In other words, by inflating the Initial Listing Price and

specifically requiring approval by certain executives, the eventual loss inflicted upon the

Defendants can be delayed.

93.     The OCWEN-owned assets were also marketed and prepared for sale differently

than other REO properties.  These properties were not marketed through the ALTISOURCE

model of directing buyers to Hubzu.com and exclusively using RHSS real estate brokers.  In fact,

the properties were marketed and sold in a traditional way, using independent brokers with local

marketplace knowledge.  On a comparative basis, the return on these assets ("ROA") was higher,

favoring the Defendants.  By forgoing the use of Hubzu.com for selling OCWEN-owned assets,

the Defendants substantiate the above claim that the in-house directed brokerage model actually

reduces value and increases losses to the seller (RMBS trust).

94.     Overall, Defendants OCWEN and ALTISOURCE  favor the sale of "OCWEN

owned" or "special serviced" REO assets in which they have a distinct incentive to maximize the

profit to their bottom-line.  The special urgency and care associated with the OCWEN-owned

assets, including policies shared across separate businesses, is further evidence of their clear

misconduct and self-dealing with respect to other assets, as alleged herein.

### i.     Reducing or Deferring Principal and Interest Cash Flow to the RMBS Trusts

95.     Defendant OCWEN violates its contractual obligations to the trust under the

Pooling and Servicing Agreements to continue advancing principal and interest ("P&I") on

delinquent loans.  Through the use of internal net present value models, OCWEN may determine

that a delinquent loan is "non-recoverable", at which time it chooses to stop advancing P&I to

the trust.  This practice significantly disrupts the cash flows to the bondholders, while

dramatically lowering OCWEN's need to fund required advances.  While stop advancing occurs

most often in the Subprime and Alt-A servicing industry, OCWEN is an industry leader in low

percentage of stop advance rates; advancing on almost half the amount of delinquent loans (as a percentage) as its competitors.  The advanced amount is recorded by the servicer as an asset and can be recouped from the trust in two ways: at the final sale of the property or through a loan modification.  Not surprisingly, OCWEN also is an industry leader in loan modifications, a fast and clever way to recoup advanced P&I and "earn" HAMP payments.

96.     OCWEN is extremely incentivized to recoup past advances.  As such, Defendant OCWEN has given Defendant ALTISOURCE a mandate to prioritize loans with high advance amounts.  ALTISOURCE asset managers are directed by OCWEN executives to sell REO assets with the highest advance amounts because a rapid sale meant the fast recovery of the advanced amount, directly back to OCWEN.   In similar fashion to OCWEN-owned assets (see above), the REO assets with high advanced amounts are marketed and prepared for sale differently than other REO properties.  These properties are often sold through traditional methods, away from Hubzu.com, and are reduced in price or discounted greater to initiate a faster sale.  This preferential treatment is yet another incident of self-dealing, intended to enrich the Defendants at the expense of the bondholders.

C.     **DAMAGES CAUSED BY THE DEFENDANTS' MISCONDUCT**

97.     The Defendants' misconduct alleged herein results in the Defendants being unjustly enriched to the detriment of the bondholders, including the federal government and the taxpayers, all for the profits of the Defendants.  There are many different ways in which the bondholders are harmed, including the following:

(a) REO liquidated properties are sold for a lower price than the market would have allowed, because, *inter alia*, buyers are directed to Hubzu.com, traditional real estate professionals are not used, and needed repairs are not made;

 (b) sales of liquidated properties are unnecessarily delayed while fees and costs are churned;

(c) fees and commissions charged are excessive, unreasonable, and unjustified, resulting in a lower return to the bondholders even when the property is sold; and

(d) cash flow is withheld from the trust and bondholders;

98.    As noted above, as of 9/30/2012 Fannie Mae and Freddie Mac owned over $100 billion in non-Agency RMBS. Overall, Relator estimates that Fannie and Freddie have owned about 18% of OCWEN's book of business, and that in late 2012 OCWEN serviced about $23 billion in RMBS owned by Fannie Mae and Freddie Mac.  Also as noted above, other parts of the federal government own RMBS bonds as well, or have put federal money at risk in the non-Agency RMBS market.

99.    By failing to comport with the requirements of the Pooling and Servicing Agreements, and otherwise engaging in a fraudulent scheme to enrich themselves at the expense of the bondholders (in particular, the United States), Defendants have violated the Federal FCA. These violations have exposed, and continue to expose, the United States to substantial losses on its RMBS holdings.

100.    On information and belief, the practices complained of herein have existed since at least 2006. Relator has knowledge that the misconduct has occurred since at least 2009 and is continuing.

## CLAIMS FOR RELIEF

## COUNT ONE

## Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

### Presenting or Causing to be Presented False or Fraudulent Claims

101.    Plaintiff and the United States reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

102.    This is a claim brought by Plaintiff and the United States to recover treble damages, civil penalties and the cost of this action, under the Federal False Claims Act, 31 U.S.C. § 3730, for Defendants' violations of 31 U.S.C. §§ 3729, *et seq.*

103.    The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A), makes liable:

"Any person who--

(A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval …."

*Id.*

104.    By virtue of the above-described acts, among others, since at least 2006, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval, and continue to cause to be submitted false or fraudulent claims for payment or approval,  in violation of 31 U.S.C.  § 3729(a)(1)(A).

105.    Plaintiff United States, unaware of the falsity of the claims that Defendants is submitting, or causing to be submitted to the United States, and in reliance on the accuracy thereof, has paid or allowed for claims that would otherwise not have been allowed or paid.

106.    It was foreseeable and in fact the intended result that those claims would be submitted.  Further, at all times relevant to the Complaint, Defendants acted with the requisite scienter.

107.    As a result of Defendants' violations of 31 U.S.C. § 3729 (a)(1)(A), the United

States is entitled to treble damages for its losses under the False Claims Act, to be determined at

trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be

presented by Defendants.

## COUNT TWO

### Violations of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(B)

**Creation or Use of False Statements or Records Material to a False or Fraudulent Claim**

108.    Plaintiff/Relator and the United States reallege and incorporate by reference each

and every one of the foregoing paragraphs as if fully set forth herein.

109.    This is a claim brought by Plaintiff and the United States to recover treble

damages, civil penalties and the cost of this action, under the Federal False Claims Act, 31

U.S.C. § 3730, for Defendants' violations of 31 U.S.C. §§ 3729, *et seq.*

110.    The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B), makes liable:

"Any person who--

(B) knowingly makes, uses, or causes to be made or used, a false record or
statement material to a false or fraudulent claim…"

*Id.*

112.    By virtue of the above-described acts, among others, Defendants  knowingly

made used or caused to be made or used false records or statements material to false or

fraudulent claims to the United States, and on information and belief continue to do so, in

violation of 31 U.S.C. § 3729(a)(1)(B).

113.    For those records and/or statements that Defendants made or used or caused to be

made or used, it was foreseeable and in fact the intended result that those statements and/or

records would be used in a way material to a claim to the United States.  Further, at all times

relevant hereto, Defendants acted with the requisite scienter.

114.    As a result of Defendants' violations of 31 U.S.C. § 3729 (a)(1)(B), the United

States is entitled to treble damages for its losses under the False Claims Act, to be determined at

trial, plus a civil penalty of $5,500 to $11,000 for each such false record and/or statement made

or used or caused to be made or used by Defendants.

## COUNT THREE

### Violations of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(G)

**Making, Using or Causing to be Made or Used, a False Record or Statement Material to an Obligation to pay or Transmit Money or Property to the United States or  Concealing, Improperly Avoiding or Decreasing an Obligation to Pay or Transmit Money or Property to the United States**

115.    Plaintiff/Relator and the United States reallege and incorporate by reference each

and every one of the foregoing paragraphs as if fully set forth herein.

116.    This is a claim brought by Plaintiff and the United States to recover treble

damages, civil penalties and the cost of this action, under the Federal False Claims Act, 31

U.S.C. § 3730, for Defendants' violations of 31 U.S.C. §§ 3729 *et seq.*

117.    The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G), makes liable

"Any person who--

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government …"

*Id*. The term "obligation" means:

"an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship,

42

from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment…"

31 U.S.C. § 3729(b)(3).

118.     By virtue of the above-described acts, among others, Defendants knowingly made, used, or caused to be made or used false records or statements, and/or concealed, avoided or decreased an obligation to pay or transmit money or property and continues to do so, in violation of 31 U.S.C. § 3729(a)(1)(G).

119.     As a result of Defendants' violations of 31 U.S.C. § 3729 (a)(1)(G), the United States is entitled to treble damages for its losses under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false record and/or statement made or used or caused to be made or used by Defendants.

## COUNT FOUR

### Violation of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(C)

### Conspiracy to Violate the False Claims Act

120.     Plaintiff/Relator and the United States reallege and incorporate by reference each and every one of the foregoing paragraphs as if fully set forth herein.

121.     This is a claim brought by Plaintiff and the United States to recover treble damages, civil penalties and the cost of this action, under the Federal False Claims Act, 31 U.S.C. § 3730 for Defendants' violations of 31 U.S.C. §§ 3729 *et seq.*

122.     The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C), makes liable:

"Any person who--

(C) conspires to commit a violation of subparagraph (A), (B) …or (G)…"

*Id.*

43

123.    By virtue of the above-described acts and omissions, among others, Defendants have conspired from at least 2006 to violate the False Claims Act by submitting or causing to be submitted false or fraudulent claims and/or by making, using or causing to be made or used, false records or statements material to false or fraudulent claims. This conduct is continuing, all in violation of 31 U.S.C. § 3729(a)(1)(A), (B), and (C).

124.    By virtue of the above-described acts and omissions, among others, Defendants have conspired from at least 2006 to violate the False Claims Act by making, using or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States or concealing, improperly avoiding or decreasing an obligation to pay or transmit money or property to the United States. This conduct is continuing, all in violation of 31 U.S.C. § 3729(a)(1)(G) and (C).

125.    Further, at all times relevant hereto, Defendants acted with the requisite scienter.

126.    As a result of Defendants' violations of 31 U.S.C. § 3729 (a)(1)(C), the United States has suffered substantial losses and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation by Defendants.

**PRAYERS FOR RELIEF**

WHEREFORE, Relator, acting on behalf of and in the name of the United States of America, and on its and its partners own behalf, demands and prays that judgment be entered as follows against the Defendants:

(a)     In favor of the United States against the Defendants for treble the amount of damages to the United States from the violations of the Federal FCA, plus maximum civil penalties of Eleven Thousand Dollars ($11,000.00) for each such

44

violation;

(b)     In favor of the Relator for the maximum amount allowed as a relator's share

        pursuant to 31 U.S.C. § 3730(d);

(c)     For all costs of the Federal FCA civil action, to include reasonable expenses,

        attorney fees and costs incurred by Relator;

(d)     In favor of the Relator and the United States for such other and further relief as

        this Court deems to be just and equitable; and

(e)     Such other relief as this Court deems just and appropriate.


### PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS


Dated:  February 28, 2013                              Respectfully submitted,


                                                       Suzanne E. Durrell (BBO #139280)
                                                       DURRELL LAW OFFICE
                                                       180 Williams Avenue
                                                       Milton, Massachusetts 02186
                                                       (617) 333-9681
                                                       Fax: (617) 333-0014
                                                       Email: suzanne.durrell@verizon.net

                                                       Robert M. Thomas, Jr. (BBO #645600)
                                                       THOMAS & ASSOCIATES
                                                       280 Summer Street, 5th Floor
                                                       Boston, MA 02210-1131
                                                       (617) 371-1072
                                                       Fax: (888) 676-7420
                                                       Email: rmt@thomasandassoc.net